Hassan A. Zavareei (State Bar No. 181547)
Katherine M. Aizpuru*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

Annick M. Persinger (State Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6807
Facsimile: (202) 973-0950
apersinger@tzlegal.com

Norman E. Siegel*
Barrett J. Vahle*
J. Austin Moore*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: 816-714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
moore@stuevesiegel.com

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY LEMAY, DYLAN BLAKELEY, TANIA AMADOR, and TODD CRAIG, *On Behalf of Themselves and All Others Similarly Situated*, Plaintiffs, v. RING LLC, Defendant. | Case No. 2:20-cv-074 <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES, EQUITABLE, INJUNCTIVE, and DECLARATORY RELIEF** <br> (1) **NEGLIGENCE** <br> (2) **VIOLATION OF CAL. BUS. & PROF. CODE § 17200** <br> (3) **BREACH OF IMPLIED CONTRACT** <br> (4) **UNJUST ENRICHMENT** <br> (5) **INTRUSION UPON SECLUSION** <br> (6) **PUBLIC DISCLOSURE OF PRIVATE FACTS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Ashley LeMay, Dylan Blakeley, Todd Craig, and Tania Amador (collectively, "Plaintiffs"), on behalf of themselves and all persons similarly situated, bring this complaint against Defendant Ring LLC ("Defendant" or "Ring").

## I.     INTRODUCTION

1.      Ring markets and sells home security devices. Intended for use inside the home, Ring's devices feature motion-activated cameras; a "live view" that allows users to "check in on" their homes remotely; and a two-way talk feature that allows users to communicate through the devices. According to Ring, its home security devices offer "smart security here, there, everywhere." Ring promises users that it takes security seriously and will safeguard users' private information.

2.      But instead of helping families protect their homes, Ring security devices have had the opposite effect by permitting hackers to exploit security vulnerabilities in the Ring system to spy on and harass Ring customers inside their own homes.

3.      That is exactly what happened to Ashley LeMay and her husband Dylan Blakeley ("the Blakeleys"), as well as Todd Craig and his girlfriend Tania Amador. Plaintiffs purchased Ring indoor security cameras to try to protect their homes and feel safer. Instead, the Ring devices created a living nightmare by allowing intruders to come into their homes and harass them and their families.

4.      The Blakeleys purchased two of Ring's security devices on November 29, 2019, as part of a Black Friday sale. They installed the devices in their home so that Ms. LeMay could check in on their four daughters during Ms. LeMay's overnight shifts at a nearby hospital. They also hoped the devices would notify them if their middle daughter, who suffers from seizures, began to experience a seizure while Ms. LeMay was not home. At first, the cameras gave the Blakeleys peace of mind, and helped their children feel safe.

5.      That sense of security disappeared on December 4, 2019. Shortly after 8 p.m., both of the Ring cameras installed in the Blakeleys' home began live-streaming, and the Tiny Tim cover of "Tiptoe Through the Tulips," a song that appeared in a scene from the 2020

horror film "Insidious," began to play through the two-way talk feature. At the time, Ms. LeMay was out running errands, but Mr. Blakeley was at home with their children.

6.      Intrigued by the music, the Blakeleys' eight-year-old daughter, A., went to the room she shares with two of her younger sisters to investigate. But the room was empty. As A. wandered the room, looking for the source of the music, the song abruptly stopped, and a man's voice rang out: "Hello there."

7.      It was a stranger—an unknown hacker, who had taken over the Blakeleys' account and had the ability to see, hear, and speak to A. inside her own room. In a chilling exchange captured on the device's video recording, the hacker began shouting racial slurs at A. and encouraging her to misbehave. The encounter ended only after a frightened A. left the room to find her father, who disabled the device.

8.      To this day, Ring has not disclosed the identity of this unknown hacker to the Blakeleys, who have no way of knowing the motives of the digital intruder or whether he still poses a threat to the safety of their family.

9.      Only a few days later, the same thing happened to Mr. Craig and Ms. Amador when an unauthorized hacker took control of the Ring system that they share in their home.

10.      On December 9, 2019, Mr. Craig and Ms. Amador were interrupted by a voice laughing and shouting, "Ring support! Ring support!" Ms. Amador, who was napping, was awakened by the noise. Mr. Craig was standing in front of his indoor camera at the time of the breach, and jumped at the sound, at first believing Ms. Amador was playing a joke on him. But this was no joke. A stranger had hacked Mr. Craig's Ring system and was spying on the couple inside their home.

11.      The hacker then accessed the couple's doorbell camera and told them, "I'm outside your front door."

12.      The voice also threatened the couple with "termination" if they did not pay a ransom of 50 bitcoin.

13.      Ring still has not disclosed the identity of the hacker who threatened Mr. Craig and Ms. Amador. And while Ring initially told Mr. Craig that the account was hacked via Ms.

Amador's account, it later walked back that statement and has since refused to confirm how the intrusion occurred.

14.     Reports of similar hacks have surfaced across the country, including in Florida, Michigan, Georgia, Kansas, and Texas. *Vice News* recently reported on an incident in which a hacker took over a Ring camera located in Florida. The hacker played a "blaring siren" into the Ring camera, then announced, "It's your boy Chance on Nulled. How you doing?" "Chance" then blared noises and shouted racist comments at the Florida family who owned the device.

15.     "Chance" was participating in a widely livestreamed podcast, NulledCast, which features live footage of hackers taking over peoples' Ring smart-home cameras and using the two-way communication function to talk to and harass their owners.

16.     It is well known that Ring devices are vulnerable to hacking; hackers casually share software to hack Ring cameras online, including through the Discord forum.

17.     Despite the existence of the NulledCast podcast and the widespread dissemination for tips and tricks on hacking Ring devices, Ring has refused to implement even the most basic security precautions to secure their customers' accounts.

18.     Ring does not require users to implement two-factor authentication. It does not double-check whether someone logging in from an unknown IP address is the legitimate user. It does not offer users a way to view how many users are logged in. It offers no protection from brute-force entries—mechanisms by which hackers can try an endless loop of combinations of letters and numbers until they land on the correct password to unlock account. Even though these basic precautions are common and unexceptional security measures across a wealth of online services, Ring does not utilize them for its services.

19.     Breaking into a Ring account grants access to exceptionally intimate and private parts of someone's life: the inside of their homes, sometimes their bedrooms. It can put the user's physical safety, or the safety of their families, at risk. It also exposes Ring customers to the imminent risk of all manner of financial fraud, identify theft, extortion,

blackmail, or burglary. Ring's failure to take basic security precautions breached its duty to safeguard the highly sensitive information to which their users entrusted them.

20.     Ring's failure to properly safeguard access to user accounts is even more egregious in light of the presence of hacking forums and podcasts dedicated to hacking Ring devices.

21.     Yet even in light of widespread reports of hacks and unauthorized access to devices, Ring has refused to take responsibility for the security of its own home security devices, and its role in compromising the privacy of its customers. Even as its customers are repeatedly hacked, spied on, and harassed by unauthorized third parties, Ring has made the non-credible assertions that it has not suffered any data breaches and that there are no problems with the privacy and security of its devices.

22.     Plaintiffs bring this lawsuit to hold Ring responsible for its defective devices and systems, require that Ring take all necessary measures to secure the privacy of user accounts and devices, and compensate Plaintiffs and the Class members for the damage that its acts and omissions have caused.

## II.     PARTIES

23.     Plaintiffs Ashley LeMay and Dylan Blakeley are residents of Mississippi.

24.     Plaintiffs Todd Craig and Tania Amador are residents of Texas.

25.     Defendant Ring LLC is a Delaware corporation with its principal place of business in Santa Monica, California.

## III.     JURISDICTION AND VENUE

26.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and members of the Class are citizens of different states from Defendant.

27.     This Court has personal jurisdiction over Defendant because it maintains headquarters in this District and operates in this District. Through its business operations in this District, Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

28.     Venue is proper in this Court under 28 U.S.C. § 1391 because significant events giving rise to this case took place in this District, and because Defendant is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

## IV.     FACTUAL ALLEGATIONS

**Ring's Devices and Claims About the Security of Its Devices**

23.     Ring markets and sells home security devices, including a number of models intended for use inside the home. It claims that its indoor security cameras offer "smart security here, there, everywhere." Ring promises users that it takes security seriously and will safeguard consumers' private information.

24.     Ring's entire brand is built on the perception that its products increase the safety and security of consumers' homes. Ring's stated mission is "to reduce crime in neighborhoods."[1] Indeed, according to Ring, that mission "drives our team and our strategy throughout every decision."[2]

# Our Mission: To Reduce Crime in Neighborhoods

This mission drives our team and strategy throughout every decision. It's the statement we live by when we design and engineer not only the products you see today, but the future features and innovations that we will deliver for a long time to come. It also makes the late nights and seemingly impossible tasks more bearable as we know our hard work will create happy customers and make a positive impact on our homes, our communities, and the world.

25.     Ring started off as a little-known company called DoorBot, which sold video doorbells intended to make company's founder, Jamie Siminoff, "feel safer."[3] After raising

---

[1] https://shop.ring.com/pages/about
[2] https://shop.ring.com/pages/about
[3] Kim Wetzel, From Sharks to Shaq: Ring CEO Jamie Siminoff's Unusual Road to Success, Digital Trends (Sept. 29, 2018), https://www.digitaltrends.com/home/ring-ceo-jamie-siminoff-unusual-road-to-success/.

several million dollars in 2014, DoorBot relaunched as Ring, selling a sleek, elegant Wi-Fi connected video doorbell system.

26.     Amazon acquired Ring in 2018 for $1 billion. The acquisition allowed Ring to expand beyond Wi-Fi doorbells to a full range of Wi-Fi connected home security systems.

27.     Today, Ring sells a number of home security cameras for use both inside and outside the home. Ring's cameras feature motion-activated sensors; notifications sent to the user's phone, tablet, or PC; and two-way talk features that allow a user to see, hear, and speak to the person on the other side of the lens. Its models include:

        a.     Video doorbells;

        b.     Indoor security cameras ("Indoor Cams");

        c.     Indoor/outdoor security cameras ("Stick Up Cams"); and

        d.     Outdoor spotlight and floodlight cameras ("Spotlight Cams").

28.     Ring also markets and sells other home security devices, including motion-sensor-activated outdoor lighting and home alarm systems.

29.     Ring's indoor cameras operate through users' Wi-Fi networks. Once connected, users can view the video stream and operate the two-way talk feature.

30.     Ring's claims that it deters or reduces crime have helped Ring cultivate a surveillance network round the country, assisted by dozens of taxpayer-funded camera discount programs and over 600 police partnerships.[4]

31.     On its website, Ring boasts that it has worked with the National Center for Missing and Exploited Children to reunite missing children with their families[5] and worked

---

[4] Caroline Haskins, How Ring Went from Shark Tank Reject to One of America's Scariest Surveillance Companies, Slate (Dec. 3, 2019), https://www.vice.com/en_us/article/zmjp53/how-ring-went-from-shark-tank-reject-to-americas-scariest-surveillance-company.

[5] Eric Kuhn, Ring and the National Center for Missing & Exploited Children Come Together to Bring Missing Kids Home, Ring (Dec. 18, 2019), https://blog.ring.com/2019/12/18/ring-and-the-national-center-for-missing-and-exploited-children-come-together-to-bring-home-missing-kids/.

with law enforcement and communities to "achieve amazing results" like "getting stolen guns off the streets" and "helping families keep their children safe."[6]

32.    Ring's marketing and sales materials are infused with the idea that installing a Ring product in one's home will make the home safer. Ring provides the comforting message that its products are watching over American families.

33.    For example, an advertisement for Ring's "Indoor Cams" invites users to "start protecting your home, and family, with a small, sleek, and discreet Indoor Cam by Ring."[7] Ring claims that the "Indoor Cam" allows users to "bring security indoors" to achieve "piece of mind"[8]:



**Indoor Cam**
$59.99

Bring security indoors with a compact
camera that lets you check in on home
at anytime. Plug it into standard outlets
for nonstop power and peace of mind.



---

[6] Jamie Siminoff, Building Better Communities Together: How Ring Connects Communities and Law Enforcement Through the Neighbors App, Ring (Aug. 2, 2019), https://blog.ring.com/2019/08/02/building-better-communities-together/ .
[7] The All-New Indoor Ring Cam, https://www.youtube.com/channel/UCSDG3M0e2mGX9_qtHEtzj2Q.

[8] https://shop.ring.com/collections/security-cams/products/mini-indoor-security-camera.

34.   Ring also claims that the Indoor Cam allows users to "bring protection inside":

# Small in size. Big on peace of mind.

Bring protection inside with the mini marvel that packs a powerful punch. The perfect combination of tiny and mighty, Indoor Cam comes with all the features to keep you connected to home – HD video, two-way talk and motion-activated notifications – in a compact form fit for the smallest of spaces.

35.   Similarly, Ring claims that the Stick Up Cam lets users "add security anywhere they need it"[9]:

### Indoor/Outdoor Camera

Add security anywhere you need it – inside or out – with the flexible Stick Up Cam. Featuring several power choices and countless placement options, our most versatile camera gives you endless possibilities.

 Stick Up Cam

**Shop Now**

---

[9] https://shop.ring.com/pages/security-cameras

CLASS ACTION COMPLAINT

36.    Ring invites users to "add security anywhere you need it," "protect your home," and "watch over home" with the Stick Up Cam:




37.    Even Ring's packaging sends the message that Ring is synonymous with security, stating on the outside of the box: "**Peace of mind inside the home.** Ring's mission is to make neighborhood safer and we do that by delivering effective and affordable products and services to our Neighbors (what we call our customers). Our mission originally focused on us building a Ring of Security outside your home, however, we learned that our neighbors wanted protection inside the home just as much, so that's why we invented Indoor Cam. It's small enough to go anywhere and still deliver the same robust security coverage, but now built for the inside. I look forward to hearing about all the ways you use Indoor Cam and hope it gives you the same peace of mind it gives my family."

Peace of mind inside the home.

Ring's mission is to make neighborhoods safer and we do that by delivering effective and affordable products and services to our Neighbors (what we call our customers).

Our mission originally focused us on building a Ring of Security outside of your home, however, we learned that our neighbors wanted protection inside the home just as much, so that's why we invented Indoor Cam. It's small enough to go anywhere and still deliver the same robust security coverage, but now built for the inside.

I look forward to hearing about all the ways you use Indoor Cam and hope it gives you the same peace of mind it gives my family.

Jamie Siminoff
Founder and Chief Inventor
j@ring.com

**Ring actually offers poor security and easy access for hackers**

38.     But in contrast to its public promises, Ring has failed to implement even basic cybersecurity protections to guard their customers' devices from unwanted access and intrusion by third parties.

39.     Ring's indoor security cameras use Wi-Fi connections to connect to users' smartphones and tablets via users' Ring accounts and deliver their camera feeds.

40.     When a user sets up one of Ring's indoor security cameras, the Ring website prompts the user to download the Ring app and create a username and password. The username and password is linked to the user's device and grants access to the security camera feed.

41.     If a Ring user chooses to subscribe to one of its plans, they use the same username and password for their subscription plan. But a user does not need to subscribe to a plan to create a Ring account and access the devices via their smartphone or tablet.

42.     Unlike other companies that use online accounts, Ring does not require basic, industry-standard measures to protect the security of users' accounts.

43.     For example, two-factor (or dual factor) authentication is a common, industry-standard security feature in which the user provides two different authentication factors to verify themselves to better protect the user's credentials. Two-factor authentication provides higher security than single-factor authentication, in which a user can provide only a password to access an account. Although Ring offers two-factor authentication, it does not require it. And new Ring users are not prompted to enable two-factor authentication at the time they create an account—virtually assuring that the vast majority of users will never enable it.

44.     Additionally, Ring does not have security protocols in place to notify users when someone logs into their account from a new device or an unrecognized IP address. Whereas most companies request confirmation from the accountholder before allowing a suspicious sign-in to occur, Ring lets it happen no questions asked.

45.     Ring also does not provide users with a way to see how many users are currently logged in, which could identify whether an unknown party is logged in and watching a user's camera feed. In fact, Ring does not check for concurrent sessions, such as monitoring whether a user is simultaneously logged in from two places at once. Ring also does not provide users with a list of previous login attempts, making it difficult—if not impossible—to tell whether an unauthorized user has accessed a user's account.

46.     Recently, security professionals from the website Motherboard tested Ring's security procedures.[10] The testers logged into the Ring app from the United States, United

---

[10] Joseph Cox, We Tested Ring's Security. It's Awful, Vice (Dec. 17, 2019), https://www.vice.com/en_us/article/epg4xm/amazon-ring-camera-security.

CLASS ACTION COMPLAINT

Kingdom, Spain, and Singapore, in some cases simultaneously and from various devices and browsers that had never been used to log into the platform before. At no point did Ring trigger any alert, such as an email notification or text message, to the accountholder to alert them of suspicious logins or check whether the logins were legitimate.

47.    This is in stark contrast to the protections used by other internet-based companies, even those not in the business of security. For example, social media companies like Twitter, Facebook, and Instagram, email providers like Yahoo! and Gmail, and even streaming services such as Netflix notify accountholders when they detect a suspicious login attempt, or any login attempt, from a new browser, location, or device.

48.    Ring also offers no protection against repeated, automated attempts to login to its services. It is well known across the industry that hackers can use software to rapidly check whether email and password combinations will grant access to a Ring account. Hackers typically use lists of already compromised combinations from other services. Standard security measures would include a procedure for preventing someone from using software to rapidly check these account combinations after too many incorrect requests to login, by, for example, temporarily blocking access; marking their IP address as suspicious; or presenting a captcha check to ensure that the user is a human rather than an automated program. But Ring does not offer these standard measures.

49.    Ring also offers no protection against repeated attempts to try new password combinations with known email addresses, sometimes called "brute force entry." It is well known across the industry that hackers can use bots or other software to rapidly enter combinations of letters, numbers, and symbols into the password field, essentially guessing at an endless string of attempted passwords. Most online accounts will lockout a user after three to five incorrect password attempts. But Ring allows hackers (and hacker software) to try as many passwords as they want without locking them out.

50.    According to a December 18, 2019, article by *Newsweek* entitled "WHY RING SECURITY CAMERAS ARE SO EASY TO HACK"— password-cracking software used to break into Ring user accounts was offered for sale on a crime forum for just $6.00. According

to the article, a source claiming to have knowledge of the Ring hacks told *Newsweek* that accounts were accessed by a "very basic attack" known as credential stuffing, a brute force method that tries to access an account using a list of compromised login details. The source stated that, "The amount of accounts that are exposed [is] insane. The purpose of Ring is to have security but they leave all their users exposed."[11]

51.     On a desktop web browser, someone who is logged in can watch historical, archived footage, meaning that if a hacker gains access to a user's account, the hacker can watch live and historical footage of a family inside their home without providing any additional identity verification.

52.     Despite this, Ring does not offer any way to alert a user via his or her mobile phone or tablet of a suspicious login via an untrusted web browser.

53.     Ring's security failures are contrary to its public representations regarding security and constitutes a breach of the duty that Ring owes its customers. Ring persuaded its customers to install its products inside their homes by promising security, protection, and peace of mind. Ring asks its customers to trust Ring with the safety of themselves and their families, in their most intimate spaces. By failing to adequately safeguard access to users' Ring accounts, Ring violated the duty it owes its customers to keep that private information secure.

**Hacks of Ring's indoor security cameras**

54.     In just the last several weeks, dozens of news outlets have reported multiple instances of hackers gaining unauthorized access to Ring's indoor security cameras. Hackers have been recorded spying on and harassing homeowners via their Ring indoor cameras.

55.     In Brookhaven, Georgia, a stranger hacked into a family's Ring camera and harassed a woman while she lay in bed.[12]

---

[11] Jason Murdock, WHY RING SECURITY CAMERAS ARE SO EASY TO HACK, Newsweek (Dec. 18, 2019), https://www.newsweek.com/ring-amazon-cameras-cybersecurity-passwords-easy-hacking-internet-connected-1477442.

[12] Michael Seidan, "I can see you in bed. Wake up!" Woman says stranger hacked Ring camera, WSB-2 Atlanta (Dec. 11, 2019), https://www.wsbtv.com/news/local/dekalb-

56.     In Chesterfield, Virginia, a hacker took over a family's Ring camera, accessed her live camera, and spoke to her six-year-old daughter.[13]

57.     A family in Michigan was interrupted while watching TV by a hacker who took over the Ring camera in their living room.[14]

58.     A California woman reported that a hacker took over the Ring security camera in her bedroom and set off her home alarm system.[15]

59.     A hacker began speaking to a family in Wichita, Kansas, through their indoor security camera while they were preparing dinner. He even went so far as to send a pizza to the family's home.[16]

60.     A hacker demanded that a Waterbury, Connecticut woman "come here" while he hacked into multiple cameras in multiple rooms.[17]

61.     A family in Cape Coral was taunted with racial slurs by a hacker who accessed their Ring indoor camera, including asking whether the family's interracial son was a "baboon."[18]

county/-wake-up-woman-says-someone-hacked-surveillance-system-yelled-at-her-dog/1017442073/.
[13] Ezo Domingo, Hacker talks to Chesterfield family through Ring doorbell, NBC 12 (Dec. 12, 2019), https://www.nbc12.com/2019/12/12/hacker-talks-chesterfield-family-through-ring-doorbell/.
[14] Michigan family harassed by Ring hacker, Erie News Now (Dec. 12, 2019), https://www.erienewsnow.com/story/41446500/michigan-family-harassed-by-ring-hacker.
[15] Allison Matyus, Man hacks Ring camera in woman's home to make explicit comments, Digital Trends (Dec. 17, 2019), https://www.digitaltrends.com/home/man-hacks-ring-camera-in-womans-home-to-make-explicit-comments/.
[16] Caught on camera: Ring cameras hacked across the country, including Wichita, KWCH12 (Dec. 12, 2019), https://www.kwch.com/content/news/Ring-camera-hacks-raise-alarms-across-US-566153241.html.
[17] "Come Here!" Woman woken up by Ring camera hacker yelling at her, KRON 4 (Dec. 13, 2019), https://www.kron4.com/video/come-here-woman-woken-up-by-ring-camera-hacker-yelling-at-her/.
[18] Cristina Mendez, Stranger spews racial slurs over family's hacked Ring camera, NBC-2 (Dec. 11, 2019), https://www.nbc-2.com/story/41428183/stranger-spews-racial-slurs-over-familys-hacked-ring-camera.

62.     In New York, a hacker terrorized a 13-year-old boy by following him from camera to camera throughout his home.[19]

63.     Another family in Texas was harassed by a hacker who shouted profanities and racial slurs at their children.[20]

64.     Some of the unauthorized hacks were further publicized via the podcast NulledCast. NulledCast streams on Discord, a widely-used Voice over Internet Protocol (VoIP) application (an application that allows users to make voice calls using an internet connection) and digital distribution platform that is designed to allow video gaming communities to livestream games and chat while gaming.

65.     On the NulledCast, hackers take over peoples' Ring and Nest smart-home cameras, then use the two-way talk feature to harass their unsuspecting owners.

66.     For example, in one episode, a hacker who called himself "Chance" blared noises and shouted racist comments at a Florida family.[21]

67.     The NulledCast advertises itself as "over 45 minutes of entertainment," including Ring "trolling."

68.     Hackers share software for hacking Ring cameras widely on the internet, including a program that churns through previously compromised email addresses and passwords to break into Ring cameras.

**Ring offers inadequate and seemingly false excuses**

69.     In response to the numerous hacking incidents across the country, Ring has not taken responsibility, apologized, or outlined any measures it is taking to fix its security deficiencies. Instead, it has placed fault on the victims for its own deficient security features.

---

[19] Staten Island Family's Ring Camera Hacked, CBS News NY (Dec, 14, 2019), https://newyork.cbslocal.com/video/4236747-staten-island-familys-ring-camera-hacked/.
[20] Erin Jones, North Texas Family Furious After Ring Camera Hacker Terrorizes Their Children (Dec. 13, 2019), https://texasbreakingnews.com/breaking/texas-family-furious-ring-camera-hacker- terrorizes-children/.
[21] Joseph Cox and Jason Koebler, Inside the Podcast that Hacks Ring Users Live on Air, Vice (Dec.12, 2019), https://www.vice.com/en_us/article/z3bbq4/podcast-livestreams-hacked-ring-cameras-nulledcast.

For example, in response to an onslaught of news stories regarding the recent hacks, a Ring spokesperson stated, "Our security team has investigated this incident and we have no evidence of an unauthorized intrusion or compromise of Ring's systems of network. It is not uncommon for bad actors to harvest data from other company's data breaches and create lists like this so that other bad actors can attempt to gain access to other services." Ring also stated that it was "made aware of an incident where malicious actors obtained some Ring users' account credentials (e.g., user name and password) from a separate, external, non-Ring service and reused them to log in to some Ring accounts. Unfortunately, when people reuse the same username and password on multiple services, it's possible for bad actors to gain access to many account."

70.    In other words, according to Ring, the hacked cameras were accessed when unauthorized individuals were able to use a login and password combination that it obtained from somewhere else. But Ring's excuses fail to recognize that Ring's own products are not designed in a manner that would prevent such hacks, even though it could have easily implemented security features designed to do just that.

71.    Additionally, in contrast to Ring's claims that it had not suffered any security breaches, in fact, it was recently reported that thousands of Ring users' credentials were stolen and reposted to the internet.[22] Security professionals told *Buzzfeed News* that the format of the leaked data suggests it was stolen from a company database. This is just another example of Ring's apathetic approach to data security and failure to protect its customers' privacy.

---

[22] Carolyn Haskins, A Data Leak Exposed the Personal Information of Over 3,000 Ring Users, Buzzfeed News (Dec. 19, 2019), https://www.buzzfeednews.com/article/carolinehaskins1/data-leak-exposes-personal-data-over-3000-ring-camera-users?utm_source=twitter&utm_campaign=tw_wirecutter&utm_medium=social. *See also* Aaron Mak, There Sure Have Been a Lot of Reasons Not to Buy a Ring Device Recently, Slate (Dec. 20, 2019), https://slate.com/technology/2019/12/all-of-the-hacks-and-data-leaks-afflicting-ring-doorbells.html.

## V.    NAMED PLAINTIFFS' ALLEGATIONS

**Plaintiffs Ashley LeMay and Dylan Blakeley**

72.    Plaintiffs Ashley LeMay and Dylan Blakeley are a married couple residing in Nesbit, Mississippi.

73.    Ms. LeMay works the overnight shift as a medical laboratory scientist at a hospital near her home. She initially began researching indoor security cameras because her four-year-old daughter has a history of seizures. The Blakeleys wanted a way for Ms. LeMay to check on her daughter in case she began to have seizures during the night while Ms. LeMay was at work and Mr. Blakeley was asleep.

74.    Several of Ms. LeMay's neighbors have Ring doorbell cameras, so Ms. LeMay began to research the company. She ultimately purchased a two-pack of Ring Indoor Cams on November 29, 2019, from Target, as part of a Black Friday sale.

75.    The Blakeleys installed one of the cameras in the upstairs bedroom where three of their daughters sleep. They installed the second camera in the downstairs bedroom where their fourth daughter, the baby, sleeps. Ms. LeMay created a Ring account username and password. Ring did not prompt her to enable two-factor authentication. Mr. Blakeley also created a Ring account username and password. Ring did not prompt Mr. Blakely to enable two-factor authentication for his account username and password either.

76.    For four days, the Blakeleys believed that they had made the right decision by purchasing Ring indoor security cameras. They felt safe knowing that if their daughter began to experience a seizure—or, worse, if there were an intruder—the motion-activated security camera would alert them. When Ms. LeMay went out, the girls would gather in front of the camera to wave at her and say, "Good night Mommy! We love you!"

77.    All that changed on December 4, 2019. Shortly after 8 p.m., both of the Blakeleys' cameras began live-streaming, and the Tiny Tim cover of "Tiptoe Through the Tulips," a song that appeared in a scene from the 2020 horror film "Insidious," began to play through the two-way talk feature. At the time, Ms. LeMay was out running errands, but Mr. Blakeley was at home with their children.

78.     Intrigued by the music, the Blakeleys' eight-year-old daughter, A., went to the room she shares with two of her younger sisters to investigate. But the room was empty. A. wandered the room, looking for the source of the music, the song abruptly stopped, and a man's voice rang out: "Hello there."

79.     A hacker had gained unauthorized access to the Blakeleys' device. He was able to do so because Ring does not utilize ordinary, basic security precautions to secure their users' accounts.

80.     The hacker could see, hear, and speak to eight-year-old A. He began to shout racial slurs at A., who is white: "N****r! N****r! N****r!" He shouted, "You're a n****r!" and instructed A. to "go tell Mommy you're a n****r!"

81.     A., confused, asked, "Who is that?" The man responded: "I'm your best friend. I'm Santa Claus. Don't you want to be my best friend?" He told A. that she could do "whatever you want... Mess up your room, break your TV."

82.     At one point, A. screamed in distress, "Mommy!"

83.     Finally, A., terrified, left the room to tell her father that someone was "being weird upstairs." At that point, Mr. Blakeley entered the room and disabled the device.

84.     The Blakeleys changed their passwords immediately, and Ms. LeMay called Ring that day to report that her indoor security camera had been hacked. A Ring representative told her that Ring would look into it. But Ms. LeMay did not receive a response at first.

85.     The Blakeleys left for a pre-planned cruise. When they returned on December 9, they still had not heard back from Ring. Ms. LeMay emailed Ring customer support approximately three more times, then called them again. A representative informed her dismissively that "we have people who are paid to talk about that," and opined that the issue had "probably" been taken care of when Ms. LeMay changed her password. Of course, the issue had *not* been taken care of, because no one had provided any information about why or how this horrific intrusion had occurred or confirmed that it could not happen again.

86.     The representative transferred Ms. LeMay's call to another representative who refused to answer the Blakeleys' questions. He would not tell her whether Ring knew the identity of the hacker, whether a breach of Ring's security could have permitted the hack, or whether Ring had experienced a data breach itself. He would not tell her whether the hacker appeared to be local or far away.

87.     To this day, Ring has not disclosed the identity of this unknown hacker to the Blakeleys, who have no way of knowing the motives of the digital intruder or whether he could come to their home in person and threaten the physical safety of their family.

88.     Ring also has not disclosed how the hacker was able to gain access to the Blakeleys' devices. Ring blamed the Blakeleys for failing to enable two-factor authentication. But Ring did not even prompt the Blakeleys to enable two-factor authentication when they set up their accounts, and even if they had enabled it, it would not necessarily have prevented the hacker from accessing their devices.

89.     Since then, the Blakeleys have been unable to use their indoor security cameras out of fear they will be hacked again. They have also suffered emotional distress, including fear and anxiety. Ms. LeMay has had to take a leave of absence from work because of the emotional distress this incident caused her.

90.     While the precise mechanics of the hack are known only to the hacker and to Ring, it is clear the hacker was able to access the Blakeleys' account because Ring did not adopt industry-standard security procedures designed to prevent such access.

91.     The Blakeleys relied on Ring's representations that it offers security and protection to users and their families and homes. Because of Ring's promises about the level of security offered by their products and services, the Blakeleys purchased the Ring indoor security cameras and installed them in their home.

92.     The Blakeleys had a special relationship with Ring. Ring provided services to the Blakeleys, including the ability to monitor their indoor security cameras via their Ring account. The transaction between Ring and the Blakeleys was intended to benefit the

Blakeleys by providing them the ability to use the indoor cameras for all of the purposes they expected and which were intended by Ring.

93. It was entirely foreseeable to Ring that the Blakeleys would be harmed if Ring failed to adequately safeguard access to their Ring accounts and security cameras.

94. There is a close connection between Ring's failure to adequately safeguard access to the Blakeleys' Ring account and the injuries suffered by the Blakeleys. But for Ring's acts and omissions in maintaining deficient and inadequately-protected systems, and allowing hackers to gain access to customer accounts, the Blakeleys' devices would not have been taken over, their home spied on, and their family harassed. They would not have been exposed to an imminent risk of theft or fraud. This close connection is further reinforced by the broader general evidence of other Ring hacks occurring around the same time period as the hack of their devices.

95. Ring's conduct also involves moral blame. Ring markets its products as providing safety and security despite knowing that its security protocols are insufficient to protect its customers' privacy.

96. Ring owed the Blakeleys a duty to exercise reasonable care in safeguarding and protecting access to their Ring accounts and keeping them from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing security systems to ensure that users' account information is adequately secured and protected. Ring breached that duty by failing to adopt, implement, and maintain adequate security measures.

97. The injuries to the Blakeleys were reasonably foreseeable as a result of Ring's failure to exercise reasonable care in safeguarding their account information.

98. Had they known the truth about Ring's substandard data security practices, the Blakeleys would not have purchased products from Ring or would have paid substantially less, and they would not have installed them in their home, created Ring accounts, and used their Ring devices.

99.     If the Blakeleys could be certain that Ring would implement security measures to protect their Ring accounts and devices from intrusion, they would continue to use their accounts and devices going forward.

**Plaintiffs Todd Craig and Tania Amador**

100.     Plaintiffs Todd Craig and Tania Amador reside together in Texas. Mr. Craig maintained a home security system through ADT for years. But when he learned that he could go from paying approximately $100 per month for ADT to just over $100 per year for Ring, he decided to make the switch.

101.     In December of 2018, Mr. Craig installed a Ring camera doorbell. A few months later, in the spring of 2019, he decided to expand his surveillance system. Mr. Craig purchased a Ring Stick Up Cam security camera from Amazon for use in the home that he and Ms. Amador share. He installed it in their living room and kitchen area. Mr. Craig also purchased and installed two outdoor cameras and an alarm system from Ring.

102.     Based on Ring's representations about the safety and security it offers, and its commitment to protecting its users, Mr. Craig purchased these devices and installed them, and Ms. Amador agreed to the installation and use of the indoor cameras in the home that they share.

103.     Mr. Craig works in the information technology industry and his ordinary practice is to create unique sixteen-character passwords for each one of his accounts, which he did when he created his Ring account. The Ring website notified Mr. Craig that his password was "very strong."

104.     Ms. Amador also created a Ring account so that she could access their indoor security cameras. Her password was a unique fourteen-character password that she did not use with other accounts. The Ring website also notified Ms. Amador that her password was "very strong."

105.     On approximately December 9, 2019, the couple's sense of safety and security was shattered when a hacker intruded into their Ring security system. A loud voice began

CLASS ACTION COMPLAINT

shouting inside the home, "Ring support! Ring support! I would like to notify you that your account has been terminated by a hacker!"

106.    Ms. Amador was napping at the time, and was awakened by the noise. Mr. Craig was standing in front of his indoor camera at the time of the breach, and jumped at the sound.

107.    A stranger had hacked the couple's Ring system and was spying on the inside of their home.

108.    The hacker blared sirens through the Ring cameras. He threatened, "Pay this 50 bitcoin ransom or you will get terminated yourself!"

109.    When Mr. Craig heard Ms. Amador crying out for him, he initially thought she was joking. But when he heard the threatening voice of the stranger, he realized the intrusion was real.

110.    Mr. Craig hid behind a kitchen pillar to listen to what the hacker was saying. After the hacker stopped talking, Mr. Craig pulled the battery out of the camera to disable the device.

111.    The hacker then accessed the couple's doorbell camera and told them, "I'm outside your front door."

112.    Mr. Craig contacted Ring that day. The representative that he spoke to told him that an unauthorized person had accessed his security cameras through Ms. Amador's account.

113.    After Mr. Craig spoke with the first Ring representative, another Ring representative sent him an email addressed to the wrong person. The email stated that someone would reach out in three days.

114.    Mr. Craig called Ring again the following day and demanded to speak with someone from Ring's security department. He ultimately connected with Kevin Zenteno, who said only that Ring would not provide Mr. Craig with a log of the unauthorized access and would not confirm that it had been Ms. Amador's account that was used. He promised

to provide Mr. Craig with information that Mr. Craig could share with law enforcement, but never provided such information.

115.    When Mr. Craig saw that Ring was issuing public statements blaming its customers for failing to enable two-factor authentication, he asked Ring to provide an explanation for how his cameras were accessed, given that he and Ms. Amador had each created unique passwords. Ring responded that while it believed that *some* accounts had been accessed because hackers had re-used already-compromised information from another source, Ring was still investigating.

116.    Ring still has not disclosed the identity of the hacker who threatened Mr. Craig and Ms. Amador. Nor has Ring confirmed how the unauthorized access occurred or whose account the hacker was able to access.

117.    Since then, Mr. Craig and Ms. Amador has been unable to use their indoor security cameras out of fear they will be hacked again. They have both suffered emotional distress, including fear and anxiety, and are looking for an alternative home security solution. Ms. Amador has been having difficulty sleeping, is suffering from nightmares, and is afraid to sleep in the couples' bedroom. She is constantly terrified of being spied on, or worse, by the unknown hacker.

118.    While the precise mechanics of the hack are known only to the hacker and to Ring, it is clear the hacker was able to access Mr. Craig's and/or Ms. Amador's Ring accounts because Ring did not adopt industry-standard security procedures designed to prevent such access.

119.    Mr. Craig and Ms. Amador relied on Ring's representations that it offers security and protection to users and their families and homes. Because of Ring's promises about the level of security offered by its products and services, Mr. Craig purchased Ring's whole-home security system, including a camera doorbell, outdoor cameras, smoke alarms, motion sensors, window/door sensors, and an indoor camera, and he and Ms. Amador created Ring accounts and installed the devices in their home.

120.    Mr. Craig and Ms. Amador had a special relationship with Ring. Ring provided services to Mr. Craig and Ms. Amador, including the ability to monitor their indoor security camera via their Ring accounts. The transaction between Ring, on the one hand, and Mr. Craig and Ms. Amador, on the other, was intended to benefit Mr. Craig and Ms. Amador by providing them the ability to use the indoor cameras for all of the purposes they expected and which were intended by Ring.

121.    It was entirely foreseeable to Ring that Mr. Craig and Ms. Amador would be harmed if Ring failed to adequately safeguard access to their Ring accounts and security cameras.

122.    There is a close connection between Ring's failure to adequately safeguard access to the Ring accounts of Mr. Craig and Ms. Amador, and the injuries they suffered. But for Ring's acts and omissions in maintaining deficient and inadequately-protected systems, and allowing hackers to gain access to customer accounts, their devices would not have been taken over, their home spied on. They would not have been harassed and exposed to an imminent risk of theft or fraud. This close connection is further reinforced by the broader general evidence of other Ring hacks occurring around the same time period as the hack of their devices.

123.    Ring's conduct also involves moral blame. Ring markets its products as providing safety and security despite knowing that its security protocols are insufficient to protect its customers' privacy.

124.    Ring owed Mr. Craig and Ms. Amador a duty to exercise reasonable care in safeguarding and protecting access to their Ring accounts and keeping them from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing security systems to ensure that users' account information is adequately secured and protected. Ring breached that duty by failing to adopt, implement, and maintain adequate security measures.

125.    The injury to Mr. Craig and Ms. Amador was reasonably foreseeable as a result of Ring's failure to exercise reasonable care in safeguarding their account information.

126.    Had he known the truth about Ring's substandard data security practices, Mr. Craig would not have purchased products from Ring or would have paid substantially less, and he and Ms. Amador would not have installed them in their home, created Ring accounts, and used their Ring devices.

127.    If Mr. Craig and Ms. Amador could be certain that Ring would implement security measures to protect their Ring accounts and devices from intrusion, they would continue to use their accounts and devices going forward.

## VI.    CLASS ALLEGATIONS

102.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs, individually and on behalf of all others similarly situated, bring this lawsuit on behalf of themselves and as a class action on behalf of the following Classes:

> **Class:** All persons who purchased an indoor security camera[23] from Ring LLC during the applicable limitations period.

> **Subclass:** All persons who purchased an indoor security camera from Ring LLC during the applicable limitations period and whose Ring account(s) were accessed by an unauthorized third party.

103.    Excluded from the Classes are any entities, including Defendant, and Defendant's officers, agents, and employees. Also excluded from the Classes are counsel for Plaintiffs, the judge assigned to this action, and any member of the judge's immediate family.

104.    Members of the Classes are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed that the Classes are comprised of thousands of members.

105.    Common questions of law and fact exist as to all members of the Classes.  These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Classes.  Such common and legal factual questions include:

---

[23] "Indoor security camera" means the Indoor Cam, the Stick Up Cam, and the Indoor/Outdoor Camera.

a.    Whether Defendant's acts and practices complained of herein amount to egregious breaches of social norms;

b.    Whether Defendant violated Plaintiffs' and Class Members' privacy rights;

c.    Whether Defendant acted negligently;

d.    Whether Plaintiffs and the Class Members were harmed;

e.    Whether Defendant intruded upon Plaintiffs' and the Class members' seclusion;

f.    Whether Defendant and Plaintiffs formed implied contracts;

g.    Whether Defendant breached implied contracts with Plaintiffs and the Class Members;

h.    Whether Defendant's conduct was unfair;

i.    Whether Defendant's conduct was fraudulent;

j.    Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, injunctive relief, restitution, and disgorgement; and

k.    Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

106.    Plaintiffs' claims are typical of the members of the Classes as all members of the Classes are similarly affected by the Defendant's actionable conduct.  Defendant's conduct that gave rise to the claims of Plaintiffs and members of the Classes is the same for all members of the Classes.

107.    Plaintiffs will fairly and adequately protect the interests of the Classes because they have no interests antagonistic to, or in conflict with, the Classes that Plaintiffs seek to represent.  Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation, including data privacy litigation.

108.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of

evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

109.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

110.    Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

111.    Plaintiffs suffer a substantial and imminent risk of repeated injury in the future.

112.    California law applies to the claims of all Class Members.

113.    The State of California has sufficient contacts to Defendant's relevant conduct for California law to be uniformly applied to the claims of the Classes. Application of California law to all relevant Class Member transactions comports with the Due Process Clause given the significant aggregation of contacts between Defendant's conduct and California.

114.    Ring is headquartered and does substantial business in California.

115.    A significant percentage of the Class Members are located in, and Ring aimed a significant portion of its unlawful conduct at, California.

116.    The conduct that forms the basis for each Class Member's claims against Ring emanated from Ring's headquarters in Santa Monica, California, including Ring's misrepresentations and omissions regarding security and decisions to implement substandard security practices as alleged herein.

117.    California has a greater interest than any other state in applying its law to the claims at issue in this case. California has a very strong interest in preventing its resident corporations from engaging in unfair and deceptive conduct and in ensuring that harm

inflicted on resident consumers is redressed. California's interest in preventing unlawful corporate behavior occurring in California substantially outweighs any interest of any other state in denying recovery to its residents injured by an out-of-state defendant or in applying its laws to conduct occurring outside its borders. If other states' laws were applied to Class Members' claims, California's interest in deterring resident corporations from committing unfair and deceptive practices would be impaired.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On behalf of Plaintiffs and the Class)

118.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 117 set forth above as if fully written herein.

119.    As alleged herein, Plaintiffs and the Class Members enjoy a special relationship with Defendant.

120.    Defendant provided services to Plaintiffs and the Class Members, including the ability to monitor their indoor security cameras via their Ring accounts. The transactions between Defendant and the Class Members are intended to benefit the Plaintiffs and the Class Members by providing them the ability to use the indoor cameras for all of the purposes they expected and which were intended by Defendant.

121.    It was entirely foreseeable to Defendant that Plaintiffs and the Class Members would be harmed if it failed to adequately safeguard access to their Ring accounts and security cameras. Failure to protect their Ring accounts and access to their security cameras was likely to result in injury to Plaintiffs and the Class Members because hackers could gain unauthorized access to private information about their lives, spy on them, harass them, threaten them, endanger them, and commit financial fraud or theft using information learned through the unauthorized access.

122.    There is a close connection between Defendant's failure to adequately safeguard access to the Ring accounts of the Class Members and the injuries suffered by them. But for Defendant's acts and omissions in maintaining inadequate security, and

allowing hackers to gain access to customer accounts, Plaintiffs' devices would not have been taken over, their homes spied on, and loved ones harassed. This close connection is further reinforced by the broader general evidence of hacks occurring around the same time period as the hack of Plaintiffs' devices.

123.    Defendant's conduct also involves moral blame. Aware of the vulnerability of its customers, and the sensitive nature of the information available to anyone who watches an indoor camera security feed, Defendant has not taken sufficient actions to prevent hackers from gaining unauthorized access.

124.    Defendant owed Plaintiffs and the Class Members a duty to exercise reasonable care in safeguarding and protecting access to their Ring accounts and keeping them from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing security systems to ensure that users' account information is adequately secured and protected. Defendant breached that duty by failing to adopt, implement, and maintain adequate security measures.

125.    Plaintiffs and the Class Members were harmed by Defendant's failure to exercise reasonable care in safeguarding their account information, and that harm was reasonably foreseeable.

### COUNT II
### Violation of California Unfair Competition Law ("UCL")
### (On behalf of Plaintiffs and the Class)

126.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 117 set forth above as if fully written herein.

127.    Plaintiffs have standing to pursue this cause of action because Plaintiffs suffered injury in fact and lost money as a result of Defendant's misconduct described herein.

128.    As described herein, Defendant advertised their products and services as enhancing security and safety, but in fact provided products and services that were highly vulnerable to hacking and that worsened the safety and security of Plaintiffs and the Class Members.

CLASS ACTION COMPLAINT

129.   Plaintiffs would continue using their Ring products and services if they could be assured that Defendant would take adequate security measures to protect the security of their accounts and cameras going forward.

130.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200. Defendant has engaged in business acts and practices that, as alleged above, constitute unfair competition in violation of Business and Professions Code section 17200.

131.   Defendant's acts, as described herein, are "fraudulent" because they are likely to deceive the general public.

132.   Defendant's business practices, as alleged herein, violate the "unfair" prong of the UCL because they offend an established public policy and are immoral, unethical, and unscrupulous or substantially injurious to consumers.

133.   The reasons, justifications, or motives that Defendant may offer for the acts and omissions described herein are outweighed by the gravity of harm to the victims. The injuries suffered by Plaintiffs and the Class Members are substantial, and are not outweighed by any countervailing benefits to consumers or competition.

134.   Defendant's business practices described herein also violate the UCL because Defendant falsely represented that goods or services have characteristics they do not have, namely, good security; falsely represented that its goods or services are of a particular standard when they are of another; advertised its goods and services with intent not to sell them as advertised; represented that the subject of a transaction was supplied in accordance with a previous representation when it was not; and/or made material omissions regarding the security of Ring's devices.

135.   As a result of Defendant's unfair business practices, Plaintiffs and the Class Members suffered injury.

136.   If Defendant is permitted to continue to engage in the unfair and fraudulent business practices described above, its conduct will engender further injury, expanding the

number of injured members of the public beyond its already large size, and will tend to render any judgment at law, by itself, ineffectual. Under such circumstances, Plaintiffs and the Class have no adequate remedy at law in that Defendant will continue to engage in the wrongful conduct alleged herein, thus engendering a multiplicity of judicial proceedings. Plaintiffs and the Class request and are entitled to injunctive relief, enjoining Defendant from engaging in the unfair and fraudulent acts described herein.

137. The basis for Plaintiffs' claims emanated from California, where the primary decisions regarding what security measures to implement (or not) into Ring's devices occurred. Ring affirmatively instructs its users to contact Ring at an address in Santa Monica, California, with questions about "data protection."

## COUNT III
## Breach of Implied Contract
## (On behalf of Plaintiffs and the Class)

138. Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 117 set forth above as if fully written herein.

139. Defendant sold Ring cameras to Plaintiffs and the Class Members. In exchange, Defendant received benefits in the form of monetary payments.

140. Defendant has acknowledged these benefits and accepted or retained them.

141. Implicit in the exchange of the cameras for the monetary payments is an agreement that Defendant would provide cameras suitable for their purpose—providing home security—and not designed with flaws that render them vulnerable to hacking and therefore inadequate to provide safety and security.

142. Without such implied contracts, Plaintiffs and the Class Members would not have paid for and conferred benefits on Defendant, but rather would have chosen an alternative security system that did not present such dire hidden safety risks.

143. Plaintiffs and the Class Members fully performed their obligations under their implied contracts with Defendant, but Defendant did not.

144. Defendant breached its implied contracts with Plaintiffs and the Class Members by failing to acknowledge and repair the inherent vulnerabilities in their accounts

and cameras. These circumstances are such that it would be inequitable for Defendant to retain the benefits received.

145.    As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiffs and the Class Members, Plaintiffs and the Class Members have suffered and will suffer injury.

**COUNT IV**
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Class)**

146.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 117 set forth above as if fully written herein, and to the extent necessary, assert this count in the alternative to their breach of implied contract claim.

147.    Defendant has profited and benefited from the purchase of its indoor security cameras by Plaintiffs and the Class.

148.    Defendant has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of the misconduct and omissions described herein, Plaintiffs and the Class Members did not receive products of the quality, nature, fitness or value represented by Defendant and that reasonable consumers expected.

149.    Defendant has been unjustly enriched by its withholding of and retention of these benefits, at the expense of Plaintiffs and the Class Members.

150.    Equity and justice militate against permitting Defendant to retain these profits and benefits.

151.    Plaintiffs and the Class Members suffered injury as a direct and proximate result of Defendant's unjust enrichment and seek an order directing Defendant to disgorge these benefits and pay restitution to Plaintiffs and the Class Members.

**COUNT V**
**Invasion of Privacy (Intrusion Upon Seclusion)**
**(On behalf of Plaintiffs and the Subclass)**

152.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 117 set forth above as if fully written herein.

153.    Plaintiffs and Subclass members have reasonable expectations of privacy in their homes.

154.    Plaintiffs' and Subclass members' privacy interest as described herein is legally protected because they have an interest in precluding the dissemination or misuse of sensitive information and an interest in making intimate personal decisions and conducting personal activities without observation, intrusion, or interference.

155.    Defendant intruded on Plaintiffs' and the Subclass Members' solitude, seclusion, and private affairs when it allowed their Ring account information to be compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

156.    Defendant declined to adopt ordinary, commonplace security measures and instead adopted dismal security features that permitted hackers to easily access user accounts. As a result of Defendant's acts, hackers have been able to gain access to Ring users' devices and spy on them inside of their homes.

157.    This intrusion is highly offensive to a reasonable person. Defendant's actions alleged herein are particularly egregious because it represents that it cares about and prioritizes security, is aware of the vulnerability of their customers, and is aware of the sensitive nature of the information available to anyone who watches an indoor camera security feed, and yet it has done nothing to prevent hackers from gaining unauthorized access and has refused to take responsibility. In fact, Defendant chose to implement security measures that were deficient and made it easy for hackers to obtain access to user accounts.

158.    Plaintiffs and Subclass Members were harmed by the intrusion into their private affairs as detailed herein.

159.    Defendant's actions and omissions described herein were a substantial factor in causing the harm suffered by Plaintiffs and Subclass Members.

160.    As a result of Defendant's actions, Plaintiffs and Subclass Members seek damages, including compensatory, nominal, and punitive damages, in an amount to be determined at trial.

## COUNT VI
### Invasion of Privacy (Public Disclosure of Private Facts)
### (On behalf of Plaintiffs and the Subclass)

161.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1 through 117 set forth above as if fully written herein.

162.    Plaintiffs and Subclass members have reasonable expectations of privacy in their homes.

163.    Plaintiffs' and Subclass members' privacy interest as described herein is legally protected because they have an interest in precluding the dissemination or misuse of sensitive information and an interest in making intimate personal decisions and conducting personal activities without observation, intrusion, or interference.

164.    Defendant declined to adopt ordinary, commonplace security measures and instead adopted dismal security features that permitted hackers to easily access user accounts. As a result of Defendant's acts and omissions, hackers have been able to gain access to Ring users' devices and spy on them inside of their homes.

165.    Thus, Defendant's acts and omissions caused the exposure and publicity of intimate details of Plaintiffs' and the Subclass Members' private lives—matters that are of no concern to the public.

166.    This intrusion is highly offensive to a reasonable person. Defendant's actions alleged herein are particularly egregious because it represents that it cares about and prioritizes security, is are aware of the vulnerability of their customers, and is aware of the sensitive nature of the information available to anyone who watches an indoor camera security feed, yet it has done nothing to prevent hackers from gaining unauthorized access and have refused to take responsibility. In fact, Defendant chose to implement security measures that were deficient and made it easy for hackers to obtain access to user accounts.

167.    Plaintiffs and Subclass Members were harmed by the public disclosure of their private affairs as detailed herein.

168.    Defendant's actions described herein were a substantial factor in causing the harm suffered by Plaintiffs and Subclass Members.

169.   As a result of Defendant's actions, Plaintiffs and Subclass Members seek damages, including compensatory, nominal, and punitive damages, in an amount to be determined at trial.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully requests that this Court enter a Judgment:

(a)   Certifying the Classes and appointing Plaintiffs as Class Representatives;

(b)   Finding that Defendant's conduct was unlawful as alleged herein;

(c)   Awarding Plaintiffs and the Class Members nominal, actual, compensatory, consequential, and punitive damages;

(d)   Awarding Plaintiffs and the Class Members statutory damages and penalties, as allowed by law;

(e)   Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

(f)   Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and expenses; and

(g)   Granting such other relief as the Court deems just and proper.

## IX.   JURY DEMAND

Plaintiffs demand trial by jury on all counts for which a jury trial is permitted.


Dated: January 3, 2020                          Respectfully submitted,

                                                 _/s/ Hassan A. Zavareei_
                                                Hassan A. Zavareei (State Bar No. 181547)
                                                Katherine M. Aizpuru*
                                                **TYCKO & ZAVAREEI LLP**
                                                1828 L Street NW, Suite 1000
                                                Washington, D.C. 20036
                                                Telephone: (202) 973-0900
                                                Facsimile: (202) 973-0950

CLASS ACTION COMPLAINT

1

Email: hzavareei@tzlegal.com
        kaizpuru@tzlegal.com

2

3

Annick M. Persinger (State Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6807
Facsimile: (202) 973-0950
Email: apersinger@tzlegal.com

4

5

6

7

8

Norman E. Siegel*
Barrett J. Vahle*
J. Austin Moore*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: 816-714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
moore@stuevesiegel.com

9

10

11

12

13

14

*pro hac vice* applications forthcoming

15

*Counsel for Plaintiffs and the Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT